UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 4:19CR208 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| FRANK MARTINEZ, JR., | ) | |
| | ) | |
| DEFENDANT. | ) | |

The arrest of defendant Frank Martinez, Jr. ("Martinez") on federal drug trafficking charges unfolded in three stages. First, in 2018, state law enforcement investigating a drug trafficking organization ("DTO") in Youngstown, Ohio, discovered through a confidential informant that Martinez—the half-brother of one of the leaders of the organization, Raphael Ortiz—had become involved in the DTO. Relying on this information, state agents obtained a search warrant to obtain historical cell-site location information relating to Martinez's cellular telephone. Second, in February 2019, relying in part on information obtained through the state warrant, FBI Special Agent Lee Stalnaker obtained a federal search warrant for Martinez's cell phone. Third, on March 7, 2019, Martinez was stopped for a traffic violation, during which a drug sniffing dog was deployed and indicated to the presence of narcotics, the vehicle was removed to a garage for further inspection and dismantling of the fuel tank, drugs were found behind the tank, and Martinez was arrested and charged.

Martinez now seeks suppression of all evidence seized during the March 7, 2019 traffic

stop (Doc. No. 13 ["Mot."]). Martinez challenges the two warrants as deficient on their face and challenges the traffic stop as pretextual and improperly extended for purposes of conducting a free air dog sniff and a garage inspection/dismantling of his vehicle. The government opposes the motion (Doc. No. 19 ["Opp'n"]). The Court conducted an evidentiary hearing on issues relating to the traffic stop on August 22, 2019, and, at the conclusion of the hearing, it took the matter under advisement. For the reasons that follow, Martinez's motion to suppress is DENIED.

I. **BACKGROUND**

*Sargent Michael Trader*

Two witnesses testified at the evidentiary hearing. Sargent Michael Trader, a twenty (20) year veteran of the Ohio State Highway Patrol, serves as the Warren District Criminal Patrol Supervisor. He testified that he is part of a special operations unit that apprehends suspected criminals traveling on Ohio roadways, and he candidly explained that his team relies on traffic infractions as the justification for stopping motorists suspected of criminal activity. On March 7, 2019, he was working along Interstate 71, near Lodi, Ohio, with an interdiction team that included Trooper John Lamm of the Ohio State Highway Patrol and Lamm's canine partner, Zeus. Riding along in Sargent Trader's cruiser that evening was Sargent Trader's supervisor, Lieutenant Jared Sutton. The witness was aware that, on this particular evening, the team was looking for Martinez, who was believed to be transporting controlled substances from Texas to Youngstown.

Sargent Trader explained that when he observes a target vehicle, he looks for changes in driving behavior when the motorist sees his cruiser. This draws his attention to the vehicle, and, if he observes a traffic infraction thereafter, he initiates a traffic stop. After pulling the driver

2

over and reporting the license plate to dispatch, Sargent Trader approaches the vehicle, asks for license and registration, and poses a few initial questions to the driver, such as what brings them to Ohio and whether they have any tickets. He then calls dispatch and requests a records search for possible outstanding warrants for the driver. If he intends to have the canine officer perform a free air sniff of the vehicle for suspected narcotics, he will ask the driver to exit the vehicle and sit in his cruiser while the warrant search takes place so that the canine officer and his handler can work safely. While he processes the traffic infraction, Sargent Trader is always looking for signs of criminal activity.

At approximately 8:45 pm on March 7, 2019, Sargent Trader observed Martinez's truck traveling toward Youngstown. As he approached the Sargent's location, Martinez changed lanes from the center to the right, which Sargent Trader found suspicious. Sargent Trader then pulled directly behind Martinez, and much of what transpired was recorded on the Sargent's vehicle camera. The video depicts Martinez's vehicle drive over the right fog line[1] several times. Inasmuch as this behavior constituted an infraction of Ohio traffic laws, the Sargent radioed dispatch to advise that he was initiating the stop. (Government Hearing Exhibit ["Gov. Ex."]) 3.) It is undisputed that Trooper Lamm, who had been sitting alongside Sargent Trader, heard the radio dispatch, knew Sargent Trader was in the process of stopping Martinez, and headed to the location of the eventual stop.

As Sargent Trader approached Martinez's truck, he noticed scratches near the auxiliary fuel tank, which indicated that the fuel tank had been previously removed. He then explained to Martinez the reason for the stop. Martinez offered that he had been working in Texas for a week,

---

[1] The "fog line" is the white line that separates the road from the berm.

performing chemical cleanup at a private facility. Given the fact that only a small backpack was visible inside the truck, and there was no indication of any protective gear or changes of clothing in the vehicle, Sargent Trader found the story suspect. Along with the initial questions Sargent Trader typically poses to a motorist, given the nature of the stop, he also asked Martinez how long he had been driving that evening. Martinez responded that he had only been traveling a few hours but that he was coming from Texas. Sargent Trader found this answer, as well, to be questionable.

      Having determined that he would ask Trooper Lamm and Zeus to execute a free air sniff, Sargent Trader directed Martinez to exit his truck. He asked Martinez if he could pat him down for dangerous objects. Martinez consented, and the pat down did not reveal any weapons. Sargent Trader continued to speak with Martinez during the short walk to the police cruiser, asking him about the weather in Texas and informing Martinez that he was planning to travel to Texas in the near future to participate in a seminar. Once the two men were seated in the cruiser, Sargent Trader called dispatch to request a warrant search on Martinez. Within seconds of radioing this request, the cruiser's video camera shows Trooper Lamm and Zeus performing the free air sniff, which took less than a minute. (*See* Gov. Ex. 3.) Sargent Trader testified that Zeus had finished the search, and Trooper Lamm reported that Zeus had indicated to the smell of narcotics, before he (Trader) received a response from dispatch on the warrant search. There is no dispute that the vehicle was subsequently towed to Bears Towing, a private garage near the highway, where the fuel tank was removed and numerous kilograms of a white substance—later determined to be cocaine—were discovered.

*Trooper John Lamm*

Trooper Lamm also testified at the evidentiary hearing. He substantially corroborated Sargent Trader's testimony that the two were working together on March 7, 2019 as part of an interdiction team. He also testified to the usual procedure he followed when he was performing free air sniffs with Zeus. Trooper Lamm explained that he would remove Zeus from his cruiser, give him the "find" command, and then take him around the vehicle. As the two walked around the vehicle, Trooper Lamm was looking for any change in Zeus' behavior and breathing—such as longer breaths, excessive tail wagging, a head snap, or bracketing of the head to the left or right—that would be signs that Zeus had smelled something consistent with a narcotic odor. Then he would permit Zeus to "work the area," going high and low on the vehicle, until he indicated that he was in the presence of narcotics.[2] The trooper would then permit Zeus to play with his toy as a reward, or "praise him off," which involved praising him with "high happy tones" of his voice and playful interaction.

Turning to the events of March 7, 2019, Trooper Lamm testified that he saw Sargent Trader's vehicle pull out and follow Martinez's truck. Once he heard over the radio that Sargent Trader had initiated the stop, he waited between two and four minutes before heading to the site of the stop. When he arrived on scene, Sargent Trader was in the process of placing Martinez in the vehicle and asked the trooper to perform the free air sniff with Zeus. Upon the first pass of the vehicle, Zeus began alerting to the presence of narcotics odor once he reached the front of the vehicle—his breathing became very deep and nasally, and his head snapped to the left, before he

---

[2] Trooper Lamm distinguished between an "alert," which simply involves a change in the dog's behavior, and an "indication," which is the dog's trained final response that he has detected narcotics.

directed his attention to underneath the vehicle. This informed the trooper that Zeus was "in narcotic odor." While Zeus indicated at the front of the vehicle, Trooper Lamm noted that the wind was blowing toward the front. Trooper Lamm reported his findings, including Zeus' indication, to Sargent Trader.

## II. SUFFICIENCY OF THE AFFIDAVITS

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. Amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir. 1995) (quoting *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical concept that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud,* 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier,* 423 F.3d at 531). The Court's review of the sufficiency of the affidavit is limited to the information presented in the four-corners of the affidavit. *See Whiteley v. Warden,* 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); *Aguilar v. Texas,* 378 U.S. 108, 109 n.1, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), *abrogated on other grounds by Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Where an affidavit relies heavily upon information from a confidential source, "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances analysis." *United States v. Coffee,* 434 F.3d 887, 893 (6th Cir. 2006) (citing *Frazier,* 423 F.3d at 532). "As long as the issuing judge can conclude independently that the information is reliable, an affidavit based on the informant's tip will support a finding of probable cause." *United States v. McCraven,* 401 F.3d 693, 697 (6th Cir. 2005). "[A]n affidavit that supplies little information concerning an informant's reliability may [still] support a finding of probable cause, under the totality of the circumstances, if it includes corroborating information." *United States v. Woosley,* 361 F.3d 924, 926 (6th Cir. 2004)

Even if probable cause is lacking to support the issuance of a search warrant, a search may still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon*, 468 U.S. at 905). The "good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922-23 n.23.

The good-faith defense will not apply, however, where: 1) the supporting affidavit contains information the affiant knew or should have known is false; 2) the issuing magistrate lacked neutrality and detachment; 3) the affidavit is devoid of information that would support a

7

probable cause determination making any belief that probable cause exists completely unreasonable; or 4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted).

    1.    **State Warrant and Affidavit**

Both warrants rely on information gleaned from confidential sources. The state warrant permitted the collection of cell tower location information and related phone records for a phone number believed to belong to Martinez. The state warrant application is admittedly lean and relies predominately on a confidential source ("CS"), who advised the affiant officer that Martinez is the half-brother of one of the leaders of the DTO—Ortiz—and that Martinez is believed to be assisting Ortiz in the drug operation by transporting drugs from Texas to Youngstown. The affidavit provides that the CS reported that in November 2018 Martinez had recently moved back to Ohio from Florida. He further stated that, upon his return to Ohio, Ortiz recruited Martinez to serve as a runner for the DTO. Specifically, the CS stated that Ortiz would supply Martinez with a substantial amount of money, after which Martinez would travel to Texas and use the money to purchase drugs, which he would then transport back to Youngstown. (Doc. No. 22–1 (State Warrant and Affidavit) at 107.[3]) The CS further advised that Martinez was observed operating a charcoal colored Dodge Caravan. (*Id*. at 108.) The affidavit did not indicate how the CS came into this information, though the affiant noted that he corroborated some of the information by determining that Martinez had recently obtained a new Ohio driver's license and was renting a charcoal colored Dodge Caravan. (*Id*.) The affiant further averred that the CS had "proven reliable by providing information verified by officer's independent investigation in this

---

[3] All page numbers refer to the page identification number generated by the Court's electronic docketing system.

investigation and other ongoing investigations." (*Id*. at 109.)

The fact that the CS was known to the affiant weighs in favor of the source's reliability; however, as Martinez points out, the only information provided by the CS that was independently corroborated involved non-incriminating facts (i.e. the rental car Martinez was driving and the fact that Martinez had recently moved back to the area—as evidenced by his recent application for a new Ohio's driver's license). Still, the government argues that, even if the information contained in the application was insufficient to establish probable cause, the officer could rely upon it in good faith.

In *United States v. Neal*, 577 F. App'x 434, 447 (6th Cir. 2014), the Sixth Circuit determined that a search warrant did not provide a substantial basis for a magistrate's probable cause determination because the cooperating source could not be confirmed as reliable and the police were only able to corroborate non-incriminating facts. Still, the Court found good faith, noting that there was no evidence that the affiant knowingly included false statements, there was no showing that the magistrate abandoned his role as a neutral magistrate, and the document was not "bare bones." *Id*. at 447–49.

Likewise, here, none of the exceptions to the good faith rule in *Leon* apply. Martinez has not alleged that the supporting affidavit contains false information or that the affiant acted in bad faith, there is no evidence that the issuing magistrate had abandoned his neutrality, the affidavit

was not "bare bones," and the affidavit is not facially deficient.[4] Moreover, much of the CS's story was corroborated by the officer, albeit through innocuous facts. Because the Court finds that the affiant officer had an objectively reasonable basis for believing that the warrant was supported by probable cause, the good faith defense is available. *See, e.g., United States v. Pirtle*, 371 F. App'x 614, 616-17 (6th Cir. 2010) (good faith exception applied, despite the fact that the officer's representation that the confidential informant's information had been proven reliable in the past actually related to two controlled buys days before the warrant issued, where the officer did not demonstrate a reckless disregard for the truth).

2. **Federal Warrant and Affidavit**

The federal affidavit prepared by FBI S.A. Stalnaker included more detail and more corroboration of the confidential sources relied upon therein. The affidavit provided that the first confidential source ("CS 1") received his knowledge directly by speaking with Ortiz, that he/she was involved in drug trafficking, that his/her information had been "consistently corroborated" by independent investigation, and that he/she had provided information against his/her penal interests. (Doc. No. 22–2 (Federal Warrant and Affidavit) at 119-20.) CS 1 advised of Ortiz's

---

[4] In this regard, Martinez's reliance on *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996) is misplaced. In *Weaver*, the affiant officer used a boilerplate affidavit, filled in minimal particularized information relating solely to the description of the residence to be searched, and conducted virtually no independent corroboration. *Id*. at 1375–79. Significantly, the affidavit did not include any underlying factual information to support the informant's conclusory belief that the quantity of marijuana observed in the residence was destined for distribution. *Id*. at 1375. The Sixth Circuit has emphasized that the holding in *Weaver* is limited to its unique facts. *See United States v. Allen*, 211 F.3d 970, 974 (6th Cir. 2000) (en banc) ("*Weaver's* holding that the uncorroborated search warrant was defective is limited to the facts of that case.") Consequently, courts have routinely distinguished *Weaver. See, e.g., United States v. Hines*, 885 F.3d 919, 928 (6th Cir. 2018); *United States v. Beard*, 58 F. Supp. 2d 747, 752–53 (E.D. Mich. 1999); *United States v. Gunter*, No. 2:06-CR-05, 2006 WL 2336357, at *6 (E.D. Tenn. Aug. 10, 2006), *aff'd*, 551 F.3d 472 (6th Cir. 2009). While it is at least debatable as to whether the state affidavit in this case was robust enough to establish probable cause, the Court finds that the level of corroboration of the informant's story was enough to ensure that it was not "*so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (emphasis in original) (citing *Helton*, 314 F.3d at 824).

involvement as a heroin supplier in Youngstown. (*Id*. at 121.) A May 23, 2017 tip from an unnamed "concerned citizen" corroborated CS 1's representation that Ortiz and others were distributing narcotics on the west side of Youngstown. (*Id*.)

A second confidential source ("CS 2") reported that Martinez had recently returned to Ohio, that he was driving a charcoal colored Dodge Caravan, and that he was transporting drugs from Texas for Ortiz.[5] The affidavit indicated that this source obtained his/her information directly from Martinez. (*Id*. at 120.) The affidavit also provided that, on January 18, 2019, CS 2 advised that Martinez was currently out of town and believed to be in Texas, and that he was using his job as an excuse to travel. (*Id*. at 122.) The affiant further averred that cell tower information showing that Martinez had traveled to Texas three times in October and November 2018, independently corroborated CS 2's belief that Martinez was transporting drugs from Texas. (*Id*.)

Given the substantial corroboration of the information offered by the confidential sources, including the location information derived from the state warrant, the Court finds that a magistrate could "conclude independently that the informant[s] [are] reliable[.]" *See Craven*, 401 F.3d at 697. Additionally, the fact that both confidential sources acquired their information first

---

[5] It would appear that CS 2 is the same confidential source mentioned in the state application. As was the case with CS 1, CS 2 had a drug trafficking history, had provided information that was consistently corroborated by FBI independent investigation, and had provided information against his/her penal interests. (*Id*. at 120.) The affiant candidly admitted that neither source had previously provided information that had led to an arrest and both individuals were receiving consideration for their cooperation. (*Id*. at 119-20.)

hand provides further justification for the magistrate judge's reliability determination. *See Coffee*, 434 F.3d at 893. Accordingly, the Court finds that the information was sufficient to support a finding of probable cause.

Alternatively, the Court finds that SA Stalnaker was justified in relying on the warrant in good faith. Martinez has not suggested that the affidavit contained deliberately false information, there is no indication that the issuing magistrate judge abandoned his neutrality, the affidavit was not "bare-bones," and there is no contention that the warrant was so facially deficient as to render the warrant invalid. *See also United States v. McClain*, 444 F.3d 556, 565 (6th Cir. 2015) (officers had good faith where federal warrant relied in part on information gleaned from an illegal warrantless search where the prior search was "close enough to the line" to justify reliance on the illegally obtained information).

### III. PROLONGING THE TRAFFIC STOP

Martinez complains that Sargent Trader stopped Martinez on the pretext of investigating a traffic violation—crossing the highway fog line repeatedly—and then unduly delayed or extended the stop by: asking questions unrelated to the traffic infraction, requesting a free air dog sniff, and moving the truck and disassembling the fuel tank. It is well settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when he observes a driver violate a traffic law. *United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010). The officer's internal motivation is irrelevant "[s]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). At the hearing, defense counsel conceded that Trooper Trader's vehicle camera clearly depicts his

client's truck repeatedly crossing the fog line and that such an action constitutes a traffic violation. While he underscored the fact that no traffic citation ever issued, counsel further conceded that the initial stop was lawful and that an officer is not obligated to ticket every motorist stopped for a traffic violation.[6]

Martinez then states that Sargent Trader unnecessarily prolonged the stop with unrelated questions and the dog sniff. Police activities during an investigatory stop must be reasonably related to the circumstances that initially justified the stop. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008) (quotation marks and citation omitted). During the investigatory stop, police may ask questions or request documents to establish a person's identity and to confirm or dispel suspicions of criminal activity. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). An officer may also ask questions unrelated to the traffic stop so long as they do not delay the resolution of the traffic infraction. *See United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (As part of an officer's traffic mission, an officer may inquire into matters unrelated to the justification for the stop "so long as those inquiries do not measurably extend the duration of the stop.") (quotation marks and citation omitted) But "[t]he Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions." *United States v. Davis*, 430 F.3d 345, 354, 357 (6th Cir. 2005) (noting that a constitutional initial stop can "become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances") (quotation marks and citation omitted). "Simply put, 'an investigative detention must be temporary and last

---

[6] In fact, Trooper Trader testified that he did not issue *any* traffic citations in 2018 while performing interdictions.

no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Fla. v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

Consistent with the authority cited above, in investigating a traffic violation, officers may conduct a canine sniff during a lawful traffic stop as long as the sniff does not extend the duration of the stop beyond the time necessary to address the traffic violation that warranted the stop. *Rodriguez v. United States*, --U.S.--, 135 S. Ct. 1609, 1614-15, 191 L. Ed. 2d 492 (2015); *see United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) ("The Fourth Amendment does not require reasonable suspicion to justify using a drug-detection dog as long as the traffic stop and detention are not unlawful or improperly extended.") In the present case, Sargent Trader—consistent with his normal practice—immediately asked Martinez a limited number of basic questions relating to Martinez's identity, travel plans, and reason for being in Ohio. Given the nature of the observed traffic infraction, he also asked Martinez how long he had been driving. These initial information gathering questions were all related to the mission of the stop and, therefore, cannot have unduly prolonged it.

Sargent Trader also directed a number of questions to Martinez that were unrelated to the mission of the stop, including inquires regarding the weather in Texas. However, it is evident from the video that many of these questions were posed while Sargent Trader (again consistent with his practice)[7] walked Martinez back to his cruiser. Because Sargent Trader intended to and did ultimately contact dispatch from his vehicle, the few unrelated questions posed during the

---

[7] It is worth noting that, in pursuing a traffic mission, an officer may take negligibly burdensome precautions in order to complete the mission safely. *See Rodriguez*, 135 S. Ct. at 1616. An officer may, among other precautions, order a driver to exit his vehicle, even without a reason to be suspicious. *See, e.g., United States v. Lash*, 665 F. App'x 428, 431 (6th Cir. 2016). Accordingly, Martinez cannot rely on Sargent Trader's decision to have Martinez exit his truck and submit to a brief, minimally invasive weapons pat down, as evidence that Sargent Trader unduly prolonged the traffic mission.

short walk to the cruiser did not delay or prolong the stop.

Finally, and most significantly, it is evident from the video that the free air sniff occurred within seconds of Sargent Trader and Martinez entering the police vehicle, and was over before Sargent Trader heard back from dispatch on the status of the search for outstanding warrants. Given this sequence of events, the free air sniff did not extend the stop and was appropriate. *See, e.g., Bell, supra* at 542 (dog sniff and questions unrelated to the traffic stop were not unlawful because did not delay stop as the dog sniff was over before the officer received results of background check); *United States v. Smith*, No. 18-46-DLB-CJS, 2019 WL 1756279 (E.D. Ky. Apr. 19, 2019) (denying suppression motion under similar circumstances).

In fact, the timeline, constructed from the video, demonstrates that the traffic stop and the related free air sniff were conducted most expeditiously. The video reflects that from the moment the cruiser comes to a complete stop until Sargent Trader asks Martinez for his license and registration only twenty seconds elapse. (*See* Gov. Ex. 3.) Within two minutes, Sargent Trader asks Martinez to exit the vehicle and be patted down, and the two men proceed toward the cruiser. No more than two more minutes pass before Trooper Lamm arrives on scene and conducts the free air sniff, which lasts less than a minute. (*Id*.) Start to finish, the stop and free air sniff take less than five minutes and are over before Sargent Trader determines that Martinez has no outstanding warrants. Under the totality of these circumstances, the Court concludes that the state troopers did not unlawfully prolong the traffic stop.

Martinez's main point of contention is that the traffic infraction was used as a pretext for the stop to afford officers an opportunity to build their case for drug charges against Martinez. But as previously noted, an officer's subjective intent for executing the stop is irrelevant. *See*

15

*United States v. Everett*, 601 F.3d 484, 495 n.12 (6th Cir. 2010) (an officer's "subjective intent or hope to uncover unrelated criminal conduct is irrelevant"); *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008) (similar); *United States v. Zuniga*, 613 F. App'x 501, 506 (6th Cir. 2015) (an officer's intent is "immaterial" even if the officer had a "pretextual motivation for the stop"); *see, e.g., Smith*, 2019 WL 1756279, at *3 ("Defendant's argument that the officers admitted that they were looking for a reason to conduct a stop is irrelevant[.]"). What matters here is that there was probable cause to initiate the traffic stop, a fact that defense counsel conceded (and the video bore out) at the hearing.

As for the subsequent search of the vehicle and the dismantling of the fuel tank, Sargent Trader testified convincingly that, as he approached Martinez's truck, he noticed scratch marks near the auxiliary fuel tank, suggesting that the tank had been removed and reinstalled.[8] This fact, coupled with the positive dog sniff, gave officers more than sufficient justification to extend the stop and tow the truck to the garage for further inspection. *See Stepp*, 680 F.3d at 661 (even if the initial purpose of the stop was complete prior to dog sniff, police may extend beyond the original purpose if "something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot"). As was the case here, such an inspection can involve moving the car and dismantling it. *See, e.g., Zuniga*, 613 F. App'x at 508 (police properly drilled a hole through the gas tank, following a drug alert to that area of the car,

---

[8] At the hearing, defense counsel introduced photographs taken of Martinez's truck by another trooper after the vehicle was removed to Bears Towing and the fuel tank was disassembled. Sargent Trader conceded that the photographs did not show the scratch marks but testified that he was disappointed with the photographs because the trooper who took them focused on the contraband found in the vehicle instead of the condition of the vehicle. The Court finds the Sargent's testimony on this point credible, and notes that his insistence that he saw scratch marks near the auxiliary fuel tank is bolstered by the video of the traffic stop that shows Sargent Trader pointing out the scratch marks to Lieutenant Sutton.

to look for suspected drug money).

*Attenuation Exception*

In the alternative, the government argues that the drug evidence may be admitted under the attenuation exception to the exclusionary rule. Under this doctrine, a court may admit evidence that would not have been discovered but for official misconduct if the causal connection between the illegal conduct and the acquisition of the evidence is sufficiently attenuated. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The Supreme Court has identified three factors for courts to consider in determining whether the causal chain is sufficiently attenuated: (1) the time elapsed between the constitutional violation and the acquisition of the evidence; (2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

Here, the state warrant issued November 14, 2018, and the federal warrant issued February 11, 2019. Martinez was not pulled over on the traffic violation until March 7, 2019, so this first factor would weigh in favor of the exception. Second, there were clearly intervening circumstances—the traffic violation, the dog alert and indication, and Sargent Trader's observations of the scratch marks on the back of the truck. Finally, "[a]lthough the stop was [arguably] pretextual, nothing in the record shows that [Martinez] did not actually violate the traffic laws justifying the stop." *See, e.g., United States v. Powell*, 943 F. Supp. 2d 759, 789 (E.D. Mich. 2013) (applying attenuation exception under similar circumstances). Accordingly, even if one or both of the underlying warrants was fatally defective, the attenuation doctrine would serve to remove any taint associated with these documents.

## IV. CONCLUSION

For all of the foregoing reasons, Martinez's motion to suppress is DENIED in its entirety.

**IT IS SO ORDERED.**

Dated: September 11, 2019

                                                    **HONORABLE SARA LIOI**
                                                  **UNITED STATES DISTRICT JUDGE**